STATE of Missouri, Respondent,

v.

Edward HLAVATY, Appellant.

No. 62417.

Missouri Court of Appeals,
Eastern District,
Division Three.

March 1, 1994.

Gary Brotherton, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., F. Martin Dajani, Asst. Atty. Gen., Jefferson City, for respondent.

SIMON, Presiding Judge.

Appellant, Edward Hlavaty, appeals his jury convictions for conspiracy to commit murder in the first degree, § 564.016 R.S.Mo.1986 (all statutory references are to R.S.Mo.1986 unless otherwise noted) and possession of a short barrelled shotgun, § 571.020, for which he was sentenced as a prior offender to concurrent terms of ten years and three years respectively.

On appeal, appellant claims the trial court erred in: (1) overruling his objection to one of the state's peremptory jury strikes; (2) overruling his motions for acquittal because the state failed to prove each element of the

conspiracy; (3) failing to grant a mistrial when a police officer testified that appellant did not want to make any statements after his arrest; and (4) submitting MAI–CR 3d 302.04, defining reasonable doubt. We affirm.

Viewed in a light most favorable to the verdict, the evidence reveals that appellant met Carolyn Hlavaty in 1984 when they were both employed at Rosenbloom Monument Company. They were married in September of 1988. In October of 1991, Carolyn signed a lease on an apartment, and about a week later told appellant she was leaving him. On October 31, 1991, Carolyn moved out of their home. Appellant began harassing and threatening his wife. He threatened to distribute pictures of her, he told her that people were watching her, and that he was going to hire a hit man. Appellant also accused her of having an affair with her boss and sent a letter to her boss' wife stating that Carolyn and her boss were having an affair. Appellant put glue and broke off a key in his wife's car door lock, and drove behind and in front of her in a threatening manner on the highway. All of these threats and acts were interspersed with appellant's phone calls and letters of apology, and promises by appellant to leave her alone.

In the fall of 1991, appellant approached Mac Arthur Young, a convicted felon, about acquiring a gun. He had known Young, who hung around appellant's place of employment, for about five years. Appellant wanted a nine millimeter or a .38 caliber gun, and asked Young to look around to see what he could get for him. Young, however, concerned about his felony record, did not ask around for a gun. When Young told appellant he could not find a gun, appellant told him not to worry about it because he already had a gun. Appellant subsequently asked Young to watch his wife for him. Appellant told Young that he needed evidence for his divorce case, and offered him $500.00 to watch his wife. Young and appellant then began watching Carolyn; determining when she arrived at her job, what time she left, when she got home and who, if anyone, she was with. They surveilled her from appellant's car and from appellant's brother's van.

While watching her, they discussed plans to kidnap her, or hold her so that appellant could talk to her. They took a ladder from Rosenbloom Monument Company, appellant's employer, and hid it near Carolyn's apartment so that Young could climb up to her balcony and break in her apartment. At some point, Young became concerned about the legality of his actions and consulted a police officer. The officer told Young that as long as he was just watching her, there was no crime. Young continued to watch Carolyn with appellant, who was often intoxicated. Appellant stated that he wanted to kill Carolyn, and Young listened to him, never stating that he would or would not help appellant. Young was concerned that appellant might cause harm to Carolyn and did not want to be involved in that, but did not tell appellant for fear appellant would find someone else that would help him. Just before Christmas in 1991, appellant was upset with Young because he thought Young was "f___ing [him] around," and told Young that he had to get somebody else. Young responded, "Hey, you hired me to do this." Then, right around Christmas, appellant learned that his wife went to Texas to visit her parents. Appellant was upset and stated, "Dam, [sic] we missed this bitch. We are going to go down there and kill this whore." Appellant and Young then packed up appellant's car and headed out, but appellant got sick outside of St. Louis and the trip was canceled. Around Christmas and New Year's, appellant talked with Young about snatching Carolyn, abusing her, beating her up, and torturing her. Appellant had handcuffs, a stun gun, mace, rope, and masking tape which he talked about using on Carolyn. Appellant talked constantly about killing Carolyn. After she came back from Texas, Young went to talk to Lany Williams, another Rosenbloom employee, because things were getting "too deep" for him. Young told Williams about the ladder near Carolyn's apartment and they retrieved it. Young, Williams, and Williams' bosses then reported all of what had been going on to the University City Police Department. Young maintained surveillance of Carolyn with appellant, and appellant kept talking about killing his wife and Young participating in it. They came up with various

plans which changed many times. On January 13, 1992, appellant and Young went to a K–Mart store where appellant bought a shotgun which he told Young was for his son's sixteenth birthday. Some days later, appellant dropped Young off to go home and asked Young if he had a hacksaw blade, and Young replied he did not. About thirty minutes to an hour later, appellant picked up Young again and they drove toward Wentzville, Missouri. Apparently appellant had sawed off part of the barrel and removed the stock of the shotgun he had purchased, and the sawed-off shotgun was under the seat of appellant's car. While travelling over a bridge, appellant had Young discard the sawed-off portion of the barrel and the stock. The two talked about another plan, that of snatching one of Carolyn's friends and using her to get Carolyn out of the house. Later on they discussed snatching Carolyn's sister in order to use her to try and get Carolyn out of the house. With each of these plans, appellant stated that when he got Carolyn he "was going to blow that bitch's head off." Young and appellant later hid the sawed-off shotgun at Rosenbloom's behind some tombstones. They then discussed a plan to kill Carolyn before January 27, 1992, because that was the date appellant and Carolyn were to go to court on a restraining order Carolyn had previously gotten against appellant. They made a plan to get her any way possible, and appellant was going to "pick her up" and "blow her head up." Young was supposed to help appellant. During dinner one evening, the two made plans for Young to pick up the shotgun and call appellant, then they would go out and find Carolyn. When Young went to find the shotgun, however, it was gone because it had been discovered by one of the owners of Rosenbloom's. Young then found out appellant had been arrested the night before, and told everything to the University City Police and the Valley Park Police.

During all of the time Young and appellant were concocting various plans to kill Carolyn, Young was throwing "wrenches" into the works by persuading appellant that the plans were not good. He was also reporting to Williams about what was going on. However, at no time did Young tell appellant he would not help him kill his wife, or tell appellant that the idea of killing his wife was a bad one. Young did everything appellant asked him to do and went with appellant when requested, and never disavowed to appellant the idea of helping appellant kill his wife.

In his first point, appellant claims the trial court erred in failing to quash the jury panel because the state exercised a discriminatory purpose in striking venireperson Shantilal Bhakta, who appeared to be of Indian or Pakistani descent, from the venire in violation of appellant's and Mr. Bhakta's equal protection rights.

When questioned by the trial court as to why venireperson Bhakta was stricken, the prosecutor stated as follows:

> [Prosecutor]: Regarding Bhakta, two reasons I struck him. The first being that I believe his profession is as an engineer. And I think the record would reflect that the among other jurors that I struck, I struck bookkeepers; I struck the math teacher; I struck engineers; I struck accountants or accounting clerks, because of my desire not to have people that have extremely precise or technical professions sit on the jury in this case. Second reason I struck him, which is not really a racial reason, but more a cultural reason, is from my general knowledge and from my own personal knowledge about the Middle Eastern cultures of which my family is. I do know that they have, although, they profess to have a great respect for women in those cultures, I do know that the women are not treated as equal or I feel that they are not treated equally in those cultures. If, in fact, he is Indian, there have been reports and newspaper articles and documentaries about Indian men murdering their wives, because divorce is not appropriate in their culture and for that reason—for those two reasons I struck him.

Appellant argues that the prosecutor's explanation "reeks of racist intentions," and that venireperson Bhakta was removed for a "purely racially stereotypical reason."

Our Supreme Court reviewed the development of the law affecting equal protection

and peremptory strikes in *State v. Parker*, 836 S.W.2d 930 (Mo. banc), *cert. denied*, ––– U.S. –––, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992), noting that cases of the United States Supreme Court prohibit purposeful racial discrimination in the selection of jurors. *Id.*, at 933[1, 2]. Further, the Court recognized that under United States Supreme Court precedent, any party may invoke a *Batson* claim without the requirement of racial identity between the party challenging the strikes and the stricken venirepersons. *Id.*, at 933–34[1, 2]. Our Supreme Court stated:

> Once a party has established a prima facie case under *Batson*, the other party must give race-neutral reasons for the challenged peremptory strikes. The prosecutor's explanations must be more than unsubstantiated denial of discriminatory purpose or affirmance of good faith, but an explanation rising to the level of exclusion for cause is not required. To be sufficient the explanation need only be race-neutral, reasonably specific and clear, and related to the particular case to be tried. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral.

> \* \* \* \* \* \*

> Once the prosecutor offers a sufficient race-neutral explanation for the challenge, the prima facie case is rebutted. The *Batson* inquiry moves on to the third step, which requires the court to determine whether the defendant has established purposeful discrimination. To succeed, the defendant must show that the prosecutor's proffered reasons are merely pretextual and that the true motivation for the strike was racial.

*Id.*, at 934[3–6]. (Citations omitted.)

■ A reviewing court will only set aside a trial court's finding as to whether the prosecutor discriminated in the exercise of peremptory challenges if it is clearly erroneous. *State v. Blankenship*, 830 S.W.2d 1, 15[21] (Mo. banc 1992). A finding is deemed clearly erroneous where the reviewing court is left with a definite and firm impression that a mistake has been committed. *Id.* The exercise of peremptory challenges requires a subjective evaluation by counsel based upon a multitude of legitimate considerations, such as demeanor, gender, ethnic background, employment, marital status, age, economic status, religion, and many other fundamental background facts. *State v. Finerson*, 826 S.W.2d 367, 370[2] (Mo.App.1992). Prosecutors may still use horse sense and play hunches, so long as the factors on which they rely are racially neutral. *Id.*

■ Here, appellant did not challenge the prosecutor's explanation in the trial court as being merely pretextual for a racial motivation. Nor does he contend on appeal that cultural or ethnic background is not a legitimate consideration in the exercise of peremptory strikes. Appellant contends only that the prosecutor's explanation reveals a racial motivation.

The record refutes appellant's contention. The state sought to prove that appellant, through his course of conduct and the course of conduct of another, conspired to murder his wife. The evidence did not show an express agreement. Thus, we find the prosecutor's striking of venirepersons with precise or technical professions, who might require exacting evidence in order to find the element of an agreement, to be a reasonable and permissible motive. Secondly, the prosecutor's reason was based on culture, not race. The prosecutor stated that she had general and personal knowledge of Middle Eastern cultures because her family is of that culture, and because she had seen reports, articles and documentaries on the subject of Indian men murdering their wives because divorce is not appropriate in their culture. This reason is not race related. It is clear, specific and reasonably related to this particular case because the evidence showed appellant stalking, harassing, threatening, and planning to murder his wife. This is not to say that this court, the trial court or the prosecutor believe that venireperson Bhakta harbored beliefs condoning such conduct, but the nature of peremptory strikes is that they are based on hunches. Cultural and ethnic background are permissible considerations in the exercise of peremptory strikes. *See, Finerson*, at 370[2]. The trial court did not err in denying appellant's *Bat-*

*son* objection as to the prosecutor's peremptory strike of venireperson Bhakta.

Appellant's second point is that the trial court erred in overruling his motion for judgment of acquittal and in sentencing him upon his conviction because the state failed to prove that appellant entered into an agreement with Mac Arthur Young to murder his wife. Appellant argues that the facts show nothing more than discussions between appellant and Young in which Young listened while appellant vented his frustrations.

For purposes of reviewing the sufficiency of the evidence, all evidence is viewed in the light most favorable to the verdict. *State v. Weems*, 840 S.W.2d 222, 228[7] (Mo. banc 1992). All evidence supporting the verdict is regarded as true and all contrary evidence disregarded. *Id.* Review is limited to whether there is sufficient evidence from which the defendant could be found guilty by reasonable persons. *Id.*

■ The offense of conspiracy is defined in § 564.016 as follows:

A person is guilty of conspiracy with another person or persons to commit an offense if, with the purpose of promoting or facilitating its commission he agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such offense.

Section 564.016 focuses upon the conduct of one person. *State v. Mace*, 682 S.W.2d 163, 165[1] (Mo.App.1984). The conspiracy offense is committed if a person, with the purpose of promoting the offense, agrees with another person that at least one of them will engage in conduct constituting the offense. *State v. Ray*, 768 S.W.2d 119, 121[1–3] (Mo.App.1988). The subjective intent of the other individual, the person with whom the defendant is alleged to have conspired, is irrelevant. *Id.* The settled rule is that direct evidence of an explicit agreement between two or more persons is not needed to establish a conspiracy under § 564.016, but the agreement can be established by circumstantial evidence which shows no more than a tacit understanding among the participants. *State v. Revelle*, 809 S.W.2d 444, 446–47[3] (Mo.App.1991).

■ Here, the record shows that appellant first asked Young to help him with surveillance of his wife to obtain evidence in appellant's divorce case. Over time, however, the discussions turned to the subject of harming and killing his wife. Appellant began making specific plans to carry out the murder of Carolyn. While Young spoke against each of the specific plans and in fact worked to derail those plans, he did not state that the idea of murdering Carolyn was a bad one. He went along with appellant, assisted in disposition of parts of the shotgun, helped move the ladder to Carolyn's apartment, accompanied appellant on the aborted trip to Texas, and went to retrieve the shotgun from Rosenbloom's. By participating and assisting appellant, Young led appellant to believe that he would help kill appellant's wife. Although Young did not expressly agree, the evidence was sufficient for the jury to find that appellant agreed with Young that one or both of them would murder Carolyn. Point denied.

Appellant's third point is that the trial court erred in failing to sustain his motion for a mistrial when Officer Timothy Harris testified that appellant did not want to make any statements to him on January 27, 1992 because such testimony violated appellant's rights to remain silent and to due process in that the testimony constituted an impermissible comment on appellant's right to remain silent, an impermissible reference to appellant's failure to testify, and in impermissible use of appellant's post-arrest silence against him as evidence of his guilt.

The record shows that appellant was in the custody of the Williamson County, Illinois Sheriff's Department, picked up by Officer Harris of the Valley Park Police Department and brought back to St. Louis County on January 27, 1992. Officer Harris testified at trial as follows:

[Prosecutor]: And when you went there did you pick him up from Williamson County?

A. We picked him up in the Sheriff's Office.

Q. From the Sheriff's Office?

A. Right.

Q. Was he in custody when you picked him up?

A. At their county jail.

Q. Do you recall what his physical condition was at that time?

A. I think he had a bump on the head or something that he was treated for.

Q. He didn't make any statements to you or anything?

A. No, he didn't want to make any statements.

After this last response, appellant objected and requested and received an instruction that the jury disregard the last question and answer. Appellant also moved for a mistrial which the trial court overruled.

■ The law is well established in Missouri that the silence of an accused while under arrest is not admissible against him. *State v. Howell,* 838 S.W.2d 158, 161[2–5] (Mo.App.1992). The state may not use post-arrest silence either as affirmative proof of a defendant's guilt or to impeach his testimony. *Id.* It may not be shown that an accused failed to volunteer an exculpatory statement, nor may it be shown that, by his silence, he failed to deny or explain, while under arrest, an incriminating fact about which no question was asked. *Id.* The admission of such post-arrest silence constitutes an invasion of an accused's constitutional rights. *Id.* The declaration of a mistrial, however, is a drastic remedy to be exercised in extraordinary circumstances. *State v. Feltrop,* 803 S.W.2d 1, 9[12, 13] (Mo. banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). The trial court has the opportunity to observe the incident giving rise to the request for a mistrial and is in a better position than an appellant court to evaluate its prejudicial effect, thus our review extends to determining whether as a matter of law the trial court abused its discretion in refusing to declare a mistrial. *Id.*

■ Here, the record does not reveal that when Officer Harris picked up appellant in Williamson County, Illinois, appellant was confronted with any facts which might incriminate him if he remained silent or which he needed to deny or explain, or that the subject of the conspiracy was ever broached with appellant or with anyone in his presence. The record does not reflect that any questions were asked of appellant. The only reference in the record to any speaking was that appellant "kept singing the Pizza Hut song" on the ride to St. Louis. This is not a case where appellant "clammed up" in the face of a charge of guilt, made under circumstances calling imperatively for an admission or denial. *Howell,* at 163.

Under these circumstances, no inference of guilt of the crime charged could reasonably have been drawn from the prosecutor's question or Officer Harris' answer. Particularly where the trial court admonished the jury as requested by appellant, the trial court did not abuse its discretion in denying appellant's request for a mistrial. Point denied.

In his final point, appellant claims the trial court erred in submitting MAI–CR3d 302.04, defining proof beyond a "reasonable doubt" as proof which leaves the jury "firmly convinced" of appellant's guilt. Appellant claims this definition allowed a finding of guilt based on a degree of proof below that required by due process. Appellant acknowledges that his argument has been rejected by our Supreme Court, but raises the point for purposes of preservation in the event a federal court renders a contrary decision.

Our Supreme Court has held that the term "firmly convinced" is "intended to assist lay jurors in their understanding of the legal phrase 'beyond a reasonable doubt' [and that] 'firmly convinced' is essentially synonymous with 'beyond a reasonable doubt.'" *State v. Antwine,* 743 S.W.2d 51, 62–63[12] (Mo. banc 1987); *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). This holding has not changed. *State v. Griffin,* 848 S.W.2d 464, 469[8] (Mo. banc 1993). Point denied.

Judgment affirmed.

PUDLOWSKI and KAROHL, JJ., concur.