STATE of Missouri, Plaintiff/Respondent,

v.

Emory M. FUTO, Defendant/Appellant.

Emory M. FUTO, Movant/Appellant,

v.

STATE of Missouri, Respondent/Respondent.

Nos. 63922, 67201.

Missouri Court of Appeals, Eastern District, Division Four.

March 26, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 6,1996.

Case Transferred to Supreme Court June 25, 1996.
Case Retransferred to Court of Appeals Nov. 19, 1996.
Original Opinion Reinstated Nov. 27, 1996.

Nancy L. Vincent, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

GRIMM, Judge.

A jury convicted defendant of four counts of first degree murder under § 565.020, RSMo1986. The trial court sentenced him to four consecutive life terms without possibility of probation or parole. Defendant appeals.[1]

---

**1.** Defendant filed a Rule 29.15 motion which the motion court denied. He appealed that ruling, however, his brief does not contain any points related to that ruling. Thus, defendant aban- doned that appeal. Moreover, in view of our ruling on his direct appeal, any post conviction issues would be moot.

He raises eleven points. His first is dispositive. In that point, he alleges the trial court erred in directing defense counsel not to discuss defendant's testimony with him during numerous recesses while defendant testified, including two overnight.[2]

This restriction violated defendant's Sixth Amendment right to counsel. *See Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) and *Perry v. Leeke,* 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989). Therefore, we reverse and remand. Our discussion of other points is limited to those which may arise at retrial.

## I. BACKGROUND

A grand jury indicted defendant for the July 26, 1991 murders of his mother, father, and two brothers, Joe and Nick. At the time of the killings, defendant lived with his wife and son in Riverside, California.

In late May or early June, 1991, defendant asked a neighbor about getting an unregistered .38 caliber pistol. The neighbor did not have one like that for sale. About two weeks later, they again discussed it. Subsequently, in late June, defendant told neighbor, "[D]on't worry about it, it's been taken care of."

On July 20, 1991, defendant's brother, Nick, told his girlfriend he received parts of a gun in a package defendant sent. Nick said defendant was coming into town for a $200,000 drug deal. Nick said defendant wanted Nick to pick him up at the airport, drive him where he needed to go, and drop him at the airport when it was over. Nick told girlfriend the drug deal was not his idea and that the gun was for any trouble which might occur.

On July 22, defendant used an assumed name, Jim Clayton, to purchase round-trip airline tickets from California to St. Louis. The tickets showed a 10 a.m. departure on July 25, indicating an afternoon arrival in St. Louis. The tickets also provided defendant was to leave St. Louis at 6:40 a.m. on July 26. Airline records reflect that the tickets were used as purchased.

Defendant convinced a friend to drive him to the airport. He told his friend he did not want his wife to know that he was going to St. Louis. They told their wives they were going camping. Friend took defendant to the airport on July 25, stayed away from home that day and night, and picked up defendant at the airport the next day.

Defendant's brother Nick worked at his regular job in St. Louis on July 25. Late that afternoon, he gave money to a co-worker to purchase a pillow and a mallet. When he left the store about 5:30, girlfriend saw Nick with the mallet and pillow. When she asked about them, Nick told her that defendant asked him to pick them up for him.

Around 8 that evening, Nick called girlfriend. She asked, "[A]re you guys done yet?" Nick replied, "No, we're not done yet, we haven't done it." Nick said he would call her again around midnight. She never heard from him again.

At approximately 9 that evening, residents of an apartment complex heard gunshots coming from the area of a nearby cemetery. Within a short while, a car similar to the one Nick owned pulled into the apartment parking lot. Defendant was alone in the driver's seat of the car. He was looking in the direction of where the shooting took place. Late the next afternoon, Nick's body was found in woods at the back of the cemetery. He had been shot four times with a .38 caliber pistol. A new pillow similar to the one Nick bought the day before was found in a nearby cemetery dump. The pillow appeared to have blood on it.

Between 9:30 and 11:00 the evening of July 25, defendant was seen sitting in a car similar to Nick's. He was alone in the car and was fumbling with some papers.

Defendant's father worked at Anheuser Busch. On July 25, he worked until twelve midnight.

Later the same night at 2:47 a.m., actually the early morning hours of July 26, a cab company received a request for a cab. The caller gave his name as Jim, the same name

---

2. Voir dire examination began on February 1, 1993. The jury returned its verdicts on March

12. The transcript furnished us contains 9,949 pages; the legal file 885 pages.

defendant used to purchase the airline tickets. He asked to be picked up at a restaurant and taken to the airport.

The cab driver picked up defendant. At defendant's request, the driver took him to a restaurant near the airport. Defendant ate some food and was there about 20 to 25 minutes. Between 3:30 and 4:00 a.m., defendant walked over to the airport. After walking around in the airport, he caught his flight back to California.

Around 4:30 that afternoon, relatives and the police went to father and mother's home. When the police entered the home, they found mother's body in a hallway, partially inside a bedroom. Blunt trauma to the head caused her death. A mallet such as the one Nick purchased for defendant would be consistent with the type of object used to cause mother's injuries and death.

Father was found in the basement. His body had four stab wounds and three gunshot wounds. The same gun used to shoot Nick was used to shoot father.

Defendant's other brother, Joe, was found dead around 6:00 p.m. the same day. His body was in the back seat of his car, covered with trash bags. The car was parked about a block from father and mother's house. Joe was shot three times with the same gun used to kill Nick and father.

Around 4:30 a.m. the next day, July 27, the police found Nick's car. It was parked in a private business area, within walking distance of the restaurant where a cab had picked up defendant.

Later that same day, California law enforcement officers talked with defendant at his home. He told them he had been camping all week and had not "been back in St. Louis in over a year."

The following day, July 28, Missouri law enforcement officers flew to California. They spoke with defendant. He told them he had lied to the other officers, that he had been in St. Louis on July 25. He acknowledged that Nick picked him up at the airport.

Among other things, he said he went to St. Louis to help Nick with a drug deal. Later, he said he and Nick went to his parents'

home, where Nick killed their mother. They then met up with Joe and told him what had happened. Joe panicked and Nick shot and killed him.

Defendant said he and Nick then returned to his parents' home and waited for their father. When father arrived, Nick shot and killed him. They then went to the cemetery. They had a pact: Defendant was to kill Nick and then commit suicide. He admitted killing Nick, but could not kill himself. He then abandoned the car, went to the restaurant, called a cab, and ultimately went to the airport and flew home.

Defendant presented evidence, including his own testimony.

## II. RESTRICTIONS ON ATTORNEY-CLIENT COMMUNICATIONS

In his first point, defendant claims the trial court erred when it refused to allow him to consult with his attorney on matters relating to his testimony during several extended recesses while defendant testified.

Defendant began giving his testimony on March 1. Immediately before a lunch recess at 12:30 p.m., a discussion was held off the record. Then the following exchange occurred:

DEFENSE COUNSEL: I'll sum it up, you tell me when I'm wrong. I have briefly off the record indicated to the Court, the Court has had admonitions to counsel for the State, and I assume their investigators as well, concerning discussions with witnesses about their testimony and about any other testimony that may have occurred before or after. I had asked the Court whether or not the similar admonition applied between me and the defendant, the Court indicated that . . . I would be ordered not to discuss with him the nature of his testimony or anything else concerning his testimony and I indicated to the Court I would abide with that ruling. I wanted to put on the record that I have concerns and I object to the ruling based on the Sixth Amendment privileges the defendant has to consult with counsel and communicate with counsel.

THE COURT: Do you want to make a comment about that?

CIRCUIT ATTORNEY: Judge, I believe that once they get on the witness stand he has to be treated as if he never gets off until it's completed, so, I don't know.

THE COURT: I agree.

CIRCUIT ATTORNEY: I don't think that ... the Sixth Amendment right to counsel is violated in any way because once he starts to testify, he is up there until he gets done. So, I don't believe it does violate anything.

THE COURT: I agree with the State's position. I'll direct counsel, just like I've directed other counsel, not to discuss the testimony with your client.

The trial resumed at 1:45 p.m. Defendant returned to the stand and his direct examination continued until approximately 4:30. At that time, cross examination began. Shortly before 5:30, the trial court recessed for the day. At that time, this exchange occurred:

DEFENSE COUNSEL: The only thing is I wanted to make a record of the fact that I am relatively convinced the Court will give me the same admonition now as he gave me at the lunch time and I will—I will follow that admonition although I do believe that it does interfere with his Sixth Amendment and Missouri Constitutional amendments to a lawyer, but I will not have any conversation with him and I will direct all of my staff not to have any conversation with him under the Court's ruling.

THE COURT: All right. And that's the same ruling and I have been telling witnesses, including the defendant, don't discuss your testimony with anybody.

Cross examination of defendant resumed the next morning, March 2. It continued until about 5:00. Re-direct examination began and continued until the court recessed at 5:45.

The next morning, March 3, re-direct examination lasted about an hour. Defendant's testimony finally concluded before the noon recess.

Six additional recesses occurred during defendant's testimony, each apparently of rela-tively short duration. No objections were raised and no instructions were given at these later times. No suggestion is made, nor was any evidence presented, that defen-dant and his counsel had any out-of-court contact from the morning of March 1 until noon on March 3.

In the last twenty years, the United States Supreme Court has addressed this issue twice. *Geders v. United States* is a 1976 decision. There, direct examination of the defendant concluded at 4:55 p.m. Cross ex-amination was to begin the next morning. The government's counsel asked the trial court if the defendant had been instructed not to talk to anyone about the case. An extensive colloquy took place. *Geders*, 425 U.S. at 82–83, 96 S.Ct. at 1332–33, 47 L.Ed.2d at 596–97.

In that colloquy, the trial court, apparently directing its remarks to defense counsel, said it thought it was better that defendant not talk to defense counsel "about anything." Subsequently, the trial court, speaking to defendant, directed defendant not to discuss his "testimony in this case with anyone until you are back here tomorrow morning." *Id.* Defense counsel objected. However, the tri-al court overruled the objection.

The Supreme Court recognized a conflict existed "between the defendant's right to consult with his attorney during a long over-night recess in the trial, and the prosecutor's desire to cross-examine the defendant with-out the intervention of counsel, with the risk of improper 'coaching.' " *Geders*, 425 U.S. at 91, 96 S.Ct. at 1337, 47 L.Ed.2d at 601. That "conflict must, under the Sixth Amendment, be resolved in favor of the right to the assis-tance and guidance of counsel." *Id.*

The Court held that the order preventing defendant from consulting his counsel "about anything" during the overnight recess im-pinged upon his Sixth Amendment rights. It therefore reversed and remanded. *Id.*

The Supreme Court next addressed this issue in *Perry v. Leeke,* a 1989 decision. In *Perry,* the defendant testified. At the con-clusion of his direct examination, the trial court declared a 15–minute recess. The trial court directed the defendant not to talk to

anyone, including his lawyer, during the break. *Perry,* 488 U.S. at 274, 109 S.Ct. at 596, 102 L.Ed.2d at 629. When the trial resumed, defense counsel moved for a mistrial, which the trial court denied. *Id.*

On appeal, the defendant relied on *Geders.* The Supreme Court acknowledged that the line between the facts in *Geders* and the facts before it was "a thin one." *Perry,* 488 U.S. at 280, 109 S.Ct. at 600, 102 L.Ed.2d at 633. However, it distinguished *Geders,* holding that the trial court has the power to maintain the status quo during a "brief recess," a "short recess," or one for "a few minutes." *Perry,* 488 U.S. at 283–85, 109 S.Ct. at 601–02, 102 L.Ed.2d at 635–36.

However, the Supreme Court acknowledged that different concerns must be considered during an overnight recess. It recognized that during such a recess, a defendant has a constitutional right to consult with his attorney. "It is the defendant's right to unrestricted access to his lawyer for advice on a variety of trial-related matters that is controlling in the context of a long recess. The fact that such discussions will inevitably include some consideration of the defendant's ongoing testimony does not compromise that basic right." *Perry,* 488 U.S. at 284, 109 S.Ct. at 602, 102 L.Ed.2d at 635–36. (citation omitted).

In addition, *Perry* held, "a showing of prejudice is not an essential component" of a Sixth Amendment violation in this type of claim. *Perry,* 488 U.S. at 278, 109 S.Ct. at 599, 102 L.Ed.2d at 632. The Supreme Court specifically rejected the Court of Appeals rationale that the error was harmless under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Perry,* 488 U.S. at 276–80, 109 S.Ct. at 597–600, 102 L.Ed.2d at 630–33. *See also State v. Baldridge,* 857 S.W.2d 243, 252 (Mo.App. W.D.1993) ("Defendant correctly points out that she is not required to demonstrate prejudice to prevail.")

The facts before us firmly place this case within the scope of the rule in *Geders.* Here, the trial court directed defense counsel "not

to discuss the testimony with [defendant]" and told defendant, "don't discuss your testimony with anybody." These directions applied during numerous recesses, including two overnight. The period of time involved here is at least twice that in *Geders.*

Nevertheless, the State makes two arguments. First, relying on language in *Perry,* it contends that when a defendant becomes a witness, a defendant has no constitutional right to consult with his attorney while he is testifying.

The context of that statement is apparent from the sentence immediately following that on which the State relies. It states, "[A defendant] has an absolute right to such consultation before he begins to testify, but neither he nor his lawyer has a right *to have the testimony interrupted* in order to give him the benefit of counsel's advice." *Perry,* 488 U.S. at 281, 109 S.Ct. at 600, 102 L.Ed.2d at 634. What *Perry* does is extend the trial court's right to prevent consultations during a "brief recess," a "short recess," or one for "a few minutes."

Furthermore, as indicated above, *Perry* holds that during an overnight recess, a defendant does have the constitutional right to talk with his attorney. That those discussions will include "defendant's ongoing testimony does not compromise that right." *Perry,* 488 U.S. at 284, 109 S.Ct. at 602, 102 L.Ed.2d at 636.

The State's other argument contends that the critical factor is not the length of the ban, but its context. It points to *Geders,* where the overnight ban was consultation "about anything." In the case before us, the trial court directed defense counsel not to discuss defendant's testimony with defendant and directed defendant not to discuss his testimony with anybody. Implicitly, the trial court permitted defendant to discuss other aspects of the case. In support, the State primarily relies on *Snyder v. State,* 104 Md.App. 533, 657 A.2d 342 (1995).[3]

*Snyder* is not persuasive. First, we note that the appellate court reversed and re-

---

3. Although the State cites several other out-of-state cases, they basically involve short lunch breaks or instances when defense counsel did not object. They do not assist the State.

manded for a new trial on another point. Second, the error was not preserved because defendant did not object. Thus, the court's discussion of this issue is dicta.

In contrast and more directly on point is another post-*Perry* case, *United States v. Cobb,* 905 F.2d 784 (4th Cir.1990) *cert. denied, Hatcher v. United States,* 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991). In *Cobb,* defendant was being cross examined Friday afternoon when the trial court announced its weekend recess. The trial court ordered defendant "not to discuss his ongoing testimony with anyone, including his attorney, during the weekend recess." *Cobb,* 905 F.2d at 786. Defendant objected, claiming violation of his Sixth Amendment rights. The objection was overruled.

The Fourth Circuit found this order violated the Sixth Amendment and the principle laid down in *Geders.* The *Cobb* court stated:

> To remove from Cobb the ability to discuss with his attorney any aspect of his ongoing testimony effectively eviscerated his ability to discuss and plan trial strategy. To hold otherwise would defy reason. How can competent counsel not take into consideration the testimony of his client in deciding how to try the rest of the case?
>
> \* \* \* \* \* \*
>
> Similarly, the Supreme Court recognized the reality of the situation in both *Perry* and *Geders.* We have no difficulty in concluding that the trial court's order, *although limited to discussions of Cobb's ongoing testimony,* effectively denied him access to counsel.

*Id.* at 792. (emphasis added; footnotes omitted).

The briefs and our research have disclosed only one prior Missouri case which addressed this issue. In *State v. Baldridge,* 857 S.W.2d 243 (Mo.App.W.D.1993), the State was cross examining the defendant when the trial court considered an overnight recess. The trial court said that if it granted the recess, it meant that the defendant could not talk with defense counsel. Defense counsel replied, "That's fine." *Id.* at 252.

Thereafter, the trial court addressed the defendant, instructing her she would not be able to talk to her attorney overnight. She replied, "Okay." *Id.*

In denying her point, the *Baldridge* court observed that counsel failed to object to the denial of contact. Moreover, defense counsel orally acceded to the trial court's action. The court concluded that the defendant waived appellate review of this point. *Id.* *Baldridge* is not applicable in the case before us because defense counsel specifically objected on the basis of the Sixth Amendment.

Here, the trial court's order proscribed defendant from speaking with his attorney about his testimony. This proscription, which lasted almost two and one-half days, violated defendant's Sixth Amendment right to assistance of counsel. Point granted.

## III. POST–ARREST SILENCE

We next address defendant's third point. In this point, he claims the trial court erred by allowing the State to elicit evidence of defendant's post-arrest silence and repeatedly comment on it.

■ The silence of an accused while under arrest is inadmissible to show affirmative proof of guilt or to impeach testimony. *State v. Hlavaty,* 871 S.W.2d 600, 606 (Mo.App. E.D.1994). It may not be shown that an accused failed to volunteer an exculpatory statement. Nor may it be shown that, by the accused's silence, the accused failed to deny or explain, while under arrest, an incriminating fact about which no question was asked. *State v. Howell,* 838 S.W.2d 158, 161 (Mo. App.S.D.1992).

■ These constitutionally based principles apply where the defendant "stood mute"; they do not apply where a defendant did not stand mute. *Id.* They also apply when the defendant claimed the privilege to remain silent in the face of accusation. If no accusation was made, obviously the principle is not applicable. *Id.*

In his brief, defendant refers to several instances which he claims violate these principles. We consider them in turn.

## A.

A Riverside, California Sheriff's deputy went to defendant's home the day after the bodies were discovered. The deputy asked defendant if he would answer a few questions. Defendant agreed and they went to a bedroom. Deputy produced a tape recorder. Defendant became very nervous and said, "I think I need to talk to a lawyer. I don't want to talk." After conferring with his sergeant, deputy turned on the tape recorder and read the *Miranda* rights to defendant.

At trial, the tape was played. It reflected that after defendant stated he understood his rights, deputy asked, "Having those rights in mind, are you willing to talk to me?" Defendant responded, "I [sic] rather have a lawyer first."

The trial court did not err in overruling defendant's objection to this testimony. Defendant was not under arrest, nor had he been accused of anything. Under such circumstances, the above principles are not applicable.

## B.

Two St. Louis detectives flew to California to collect physical evidence from defendant, such as hair samples, blood samples, and fingernail scrapings. One detective testified, "The District Attorney advised us that [defendant] had previously invoked his *Miranda* Rights, therefore, we wouldn't be able to question him about the incident." The other detective testified, "[Deputy] informed us when he responded to [defendant's] house that he ... had invoked his *Miranda* Rights."

The two detectives picked up defendant at the jail and took him to the sheriff's office. En route, defendant said he wanted to talk about the case. A detective read his *Miranda* rights and defendant waived them.

At the sheriff's office, the detectives conducted a lengthy interview with defendant. Defendant told several different versions as to how the members of his family met their death.

The facts in *State v. Mathenia*, 702 S.W.2d 840 (Mo.banc 1986) are similar. There, the sheriff testified he advised defendant of his rights and the defendant did not then make a statement. The supreme court found that these statements were merely preliminary to the admission of the defendant's later statement. *Id.* at 842. The testimony that defendant previously invoked his *Miranda* rights "merely crystalized what was already suggested by the fact that [defendant] ultimately did make a statement." *Id.*

■ In the case before us, the two detectives' references to the *Miranda* rights and defendant's initial invocation of them did not violate his Fifth Amendment rights. These references were not used as "affirmative proof" or "to impeach" defendant. The trial court did not err in overruling defendant's objection.

## C.

Defendant was returned to St. Louis and was taken to the St. Louis County Police Department. There, a police officer advised him of his *Miranda* rights. He agreed to talk with the officer.

The officer left the room. When she returned, she and her partner brought with them a sledgehammer, a pillow, and a photograph. Defendant said he did not buy the hammer. He did not say anything about the pillow or the photograph. Defendant complains about the officer's testimony that he did not say anything about the pillow or photograph.

■ We find no error. Once the right to remain silent has been waived, testimony describing certain silence is a fair subject for comment at trial until the waiver is clearly revoked. *State v. Tims*, 865 S.W.2d 881, 885 (Mo.App.E.D.1993). Here, defendant had clearly waived his right to silence at the time of his statement.

## D.

Prior to trial, the trial court conducted a hearing on defendant's motion to suppress. Defendant testified at that hearing.

Defendant also testified at trial. On cross examination, the State used a transcript of defendant's testimony at the suppression

hearing in its attempts to impeach his testimony.

At trial, defendant testified that the St. Louis detectives, referred to in section B above, made statements about his wife and son which he took as threats. He said their threats caused him to say certain things on the tape-recorded statement which were lies.

On cross examination, defendant acknowledged making previous statements under oath. He acknowledged saying that the officers did not physically harm him or threaten to do so. Also, he indicated the detectives did not promise him anything to induce him to make the taped statement.

The State then asked defendant if he remembered testifying about whether anybody forced him to make a tape recorded statement. He said that he did not "recall that." The State then quoted from the transcript, saying:

> All right. Starting up at page 47, line number 5. On line number 5 it says, Question: "Yeah. On direct examination, you never mentioned anything about telling the officer you didn't want to speak to them except at your house at the very beginning, did you?" Answer: "I told Sheriff Mullins I did not want to speak to them." Question: "Okay. Well, then during this interview process with the police officers are you saying that you also told them at some point you didn't want to talk to them." Answer: "Yes, I did say that."

Defense counsel objected, referring the trial court to *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In addition, he requested a mistrial. The trial court sustained the objection and ordered the jury to disregard. However, it denied the motion for mistrial.

■ We observe that although the quoted question does not directly impeach, it was clearly used for that purpose. The silence of an accused while under arrest is inadmissible to impeach testimony. *Hlavaty*, 871 S.W.2d at 606. Thus, at retrial, the State should not be permitted to use this question and answer to impeach defendant.

## IV.  PRIOR CONSISTENT STATEMENTS

We next address defendant's fourth point. In this point, he claims the trial court erred "when it refused to allow [defendant] to present testimony of his prior consistent statements from witnesses Brenda Baumbach and George Morley in order to rebut charges of recent fabrication, and Dr. Max Givon, to rehabilitate [defendant] after cross examination on prior inconsistent statements."

### A.

At trial, the State raised objections before the testimony of both Baumbach and Morley. The objections related to hearsay statements allegedly made by defendant.

The trial court sustained the objections. Concerning Baumbach, it told defense counsel he could "get into what she saw but not what she heard." For Morley, the trial court prohibited any testimony "as to any prior consistent hearsay statements of the defendant about ... flights to St. Louis during the Navy, using a fake name and anything in that regard."

Defendant claims the statements of Baumbach and Morley were not hearsay, but rather were admissible to rebut charges of recent fabrication. In support of his position, he primarily relies on *State v. Mueller*, 872 S.W.2d 559, 563 (Mo.App.E.D.1994) and *State v. Ramsey*, 864 S.W.2d 320, 329 (Mo.banc 1993).

*Mueller* held that "where a witness is impeached by proof of inconsistent statements, then proof of a statement made by the witness prior to the inconsistent statement, which is consistent with the trial testimony, is admissible to rehabilitate the witness." *Mueller*, 872 S.W.2d at 563. Similarly, *Ramsey* provides that prior consistent statements are admissible for the purpose of rehabilitating a witness whose credibility was attacked by express or implied claims of recent fabrication of trial testimony. *Ramsey*, 864 S.W.2d at 329.

In his brief, defendant points to several instances in the record which he contends supports his right to use the "hearsay" statements. We have carefully reviewed the cited

instances. Nothing in the record reflects the State offered an inconsistent statement or a statement that was impliedly inconsistent with defendant's claims.

Further, it appears that the offered evidence could be considered cumulative. Thus, we cannot say the trial court abused its discretion in sustaining the State's objections.

### B.

In rebuttal, Dr. Max Givon testified concerning whether defendant suffered from a dissociative disorder. During cross examination, defendant sought to elicit statements he made to Dr. Givon about his wife being charged as an accessory if he did not cooperate. The State objected.

A lengthy colloquy ensued. The trial court observed that defendant's wife testified that she was threatened with being charged as an accessory. Further, the trial court noted that the statements were made to Dr. Givon in December, 1992, 17 months after the crimes.

Also, the State pointed out (1) it had not asked questions suggesting defendant's statements were a recent fabrication and (2) Dr. Givon was a rebuttal witness on the issue of dissociative disorder. The trial court sustained the objection.

■■ The trial court has discretion in limiting the scope of cross examination, particularly on collateral matters. *See State v. Dunn,* 817 S.W.2d 241, 245 (Mo.banc 1991). We find no abuse of that discretion. Point denied.

### V. JURY INSTRUCTIONS

In his fifth point, defendant claims the trial court erred when it refused to instruct the jury pursuant to MAI–CR 3d 300.20 and 306.04. Those instructions are required when "statements and information acquired as a result of the mental examinations made *pursuant to Section 552.030* are admitted into evidence." Notes on Use 3 to MAI–CR 3d 300.20 and Notes on Use 3 to MAI–CR 3d 306.04 (emphasis added).

Defendant gave the notice required by § 552.030.2 indicating his intent to rely on the defense of not guilty by reason of mental disease or defect. However, he did not follow the procedure set forth in § 552.030.3 for the appointment of an examiner. Nor does he point to anything in the record indicating that the examiner's report required by § 552.030.3 was filed with the trial court. Moreover, prior to trial, defendant withdrew his notice of intent to rely on this defense.

At trial, defendant asked the trial court to read MAI–CR 3d 300.20. In the discussion concerning this issue, the trial court observed that defense counsel had never contended that he "wanted these examinations to show what [defendant's] mental condition was at the time of the offenses." Defense counsel candidly agreed "that it has not been our position that there was a mental disorder that was occurring at the time" the allegations occurred.

■■ In addition, defendant does not point us to any evidence suggesting the doctors made findings that defendant was not responsible because of a mental disease or defect. The trial court did not err in refusing to read MAI–CR 3d 300.20 or to give MAI–CR 3d 306.04. *See State v. Strubberg,* 616 S.W.2d 809, 816–17 (Mo.banc 1981); *State v. Haslar,* 887 S.W.2d 610, 617 (Mo. App.W.D.1994). Point denied.

### VI. PRIOR INCONSISTENT STATEMENTS

In his seventh point, defendant alleges the trial court erred "when it refused to allow [defendant] to cross examine State witnesses about various inconsistent statements." Defendant claims he was prejudiced because the rulings left him without corroboration for his defense.

Prior to trial, an issue arose concerning the admissibility of evidence concerning defendant's father's sexual abuse of children. The trial court determined that such evidence was relevant if it pertained to the three boys, i.e. defendant, Nick, or Joe. Further, the trial court held that any of father's activities outside the three boys was irrelevant.

## A.

Cousin testified for the State. Defendant's brief alleges the State "opened the door to the inquiry by asking if they feared [father]." Defendant gives no page reference to such an inquiry of cousin.

Pursuant to its stated policy, the trial court barred cross examination of cousin on whether father sexually molested her. Thus, she was not asked if she had been sexually molested as a child. As a result, there was "no statement" to compare with a prior inconsistent statement. Nevertheless, defendant proposes that cousin's deposition testimony about sexual molestation as a child should have been allowed as a prior inconsistent statement.

■■■ A trial court has discretion to limit cross examination and introduction of evidence for impeachment. *State v. Gee*, 822 S.W.2d 892, 895 (Mo.App.E.D.1991). This discretion includes the duty to determine the relevance, materiality, and remoteness of the proffered impeachment evidence. This court will not disturb the trial court's ruling unless there is a clear abuse of discretion. *Id.* We find no abuse of discretion.·

## B.

Defense counsel cross examined aunt and determined that she never saw defendant with a black eye. Defendant then wanted aunt to identify a photo of defendant taken at her house, apparently showing him as a boy with a black eye.

The State objected. A bench conference was held. The trial court told defense counsel that if he had evidence father struck "the kids and caused the black eye then you can ask her, but if you don't have it," he could not ask her. Defense counsel did not indicate he had such evidence.

The trial court sustained the objection. However, it said that if later during the trial defense counsel acquires this evidence, the court would order the witness recalled. Nothing in the record indicates defense counsel made such an offer or representation. We find no abuse of discretion.

## C.

The final allegation concerns the trial court's refusal to allow defendant to question a witness about the specifics of what cousin told him. Suffice to say, the trial court correctly permitted defendant to lay a foundation for the possible impeachment of cousin. However, defendant did not recall cousin. Therefore, she was never asked about any inconsistency in her statements. Point denied.

## VII. OPINION TESTIMONY

In his eighth point, defendant claims the trial court erred when it overruled his objections and "allowed State witnesses to testify as to whether, in their lay opinions, they thought [defendant] was lying."

Defendant points to the testimony of seven different witnesses. We have carefully read the testimony of those witnesses. In only one did a witness express the opinion that the defendant was lying.

The one witness was a California deputy sheriff. Among other things, she related defendant's statements to her shortly after he arrived at the jail. Defendant recounted his activities of the previous few days, including that he had gone camping on Thursday. She described defendant's appearance and mannerisms.

In cross examination, she was asked about statements she made in her deposition. On redirect, the State followed up with additional statements from her deposition. The trial court permitted these questions because defendant opened the door. Ultimately, the State asked, "did you at the time feel that he was being genuine or not?" She responded, "I felt he was lying."

■■■ We recognize that generally, opinion testimony is inadmissible when the trier of facts is as capable as the witness to draw conclusions from the facts provided. *Sidebottom v. State*, 781 S.W.2d 791, 795 (Mo.banc 1989). Here, the State presented substantial evidence that defendant lied about his activities. Although the deputy sheriff's conclusion may have been incorrectly solicited and given, defendant suffered no prejudice. Point denied.

## VIII. RELEVANCY

In his ninth point, defendant claims the trial court erred when it "refused to allow [defendant] to elicit information from defense witnesses." Defendant points to eight instances where he contends the trial court excluded evidence helpful to his case.

Each trial court is vested with broad discretion in ruling on questions of relevancy of evidence. Absent a clear showing of abuse of that discretion, this court will not disturb the trial court's ruling. *State v. Snider,* 869 S.W.2d 188, 193 (Mo.App.E.D.1993); *State v. O'Dell,* 787 S.W.2d 838, 842 (Mo.App. E.D.1990).

We have carefully examined each of the eight instances. The trial court did not abuse its broad discretion in its rulings concerning these matters. Point denied.

## IX. SUFFICIENCY OF THE EVIDENCE

In his tenth point, defendant claims the trial court erred "in denying [his] motion for judgment of acquittal at the close of all the evidence, in submitting the case to the jury, and entering judgment, in that there was insufficient evidence to support the jury's conclusion that [defendant] either committed the physical acts or possessed the mental intent for murder first degree."

When reviewing for sufficiency of the evidence, this court accepts as true all of the evidence favorable to the State, including all favorable inferences drawn from the evidence, and disregards all evidence and inferences to the contrary. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo.banc 1989). Our review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.*

Viewed in this light, the evidence previously stated is sufficient to support the jury's verdicts. Point denied.

## X. EXPERT OPINIONS

In his eleventh point, defendant claims the trial court erred in allowing three witnesses to express expert opinions. He contends the State did not lay a sufficient foundation of the witnesses' qualifications.

"The test of an expert's qualification is whether the expert has knowledge from education or experience which will aid the trier of fact. The qualification of an expert is a matter resting primarily in the sound discretion of the trial court." *State v. Seddens,* 878 S.W.2d 89, 92 (Mo.App.E.D.1994). (citation omitted).

Defendant's first complaint concerns the testimony of a commander of the St. Louis County Police homicide unit. The State asked, based on his experience, if the "location of·the gunshots to the back there and their proximity to each other" would suggest how they occurred. Defendant objected on the basis it called for a conclusion and speculation.

On appeal, he contends the State failed to show that the officer had "specialized training in making determinations as to where, how, and from what distance shots were fired and wounds inflicted." That objection was not made at trial and cannot be raised for the first time on appeal. Moreover, practical experience, rather than scientific study or formal training, may qualify a witness to testify as an expert. *Id.*

Here, the officer had been a homicide investigator for 15 years. During that time, he examined several hundred homicide scenes. Most of these homicides involved firearms. His investigations examined the circumstances surrounding the shootings. The officer also testified to the position of the body when he first found it. The trial court did not abuse its discretion.

Defendant's next complaint concerns testimony of an evidence technician with nine years experience. The State asked him if the knives he found near father's body appear to be sharp enough and of sufficient strength to cut a typewriter electrical cord. Defendant objected on lack of foundation. The trial court overruled the objection.

We find no abuse of discretion in overruling that objection. The knives were received in evidence and the jury had the opportunity to observe them. Thus, it may be questiona-

ble whether the question asked was a proper subject for an expert opinion. However, that objection was not made.

The final complaint concerns testimony of a deputy medical examiner. The State asked the examiner,

Is there anything about the exit wound being there and the retrieval of a bullet between there and a shirt that [Nick] had on that would be inconsistent or consistent with [Nick's] being in the position as he was, in State's Exhibit Number 8?

The examiner replied, "Well if—if the bullet were found, one could speculate that the fact—." Defense counsel interrupted, objecting on the basis of speculation and lack of training in this field. A bench conference followed, and ultimately the trial court overruled the objection.

Although the objection was overruled, the witness did not answer the question. Rather, the State asked the examiner a similar, but different question. The examiner responded, "It's certainly consistent with it, although I don't think it proves it in my opinion." It is virtually impossible to conclude that this answer in any way prejudiced defendant. Point denied.

### XI. OTHER POINTS

Defendant raised two other points. In his second point, he alleged trial court error in refusing to permit a witness to testify. The trial court sustained the State's objection due to the lateness of endorsement. Due to our disposition, this point is moot.

In his sixth point, defendant claims the trial court erred when it refused his tendered self-defense instructions. On retrial, this instruction, if given, will be tailored by the evidence presented at that time. Thus, an extended discussion of this point would not serve any jurisprudential purpose. Rule 30.25.

The trial court's judgment is reversed, and the cause is remanded for a new trial.

AHRENS, P.J., and PUDLOWSKI, J., concur.