**STATE of Missouri, Plaintiff–Respondent,**

v.

**Esther E. WADLEY, Defendant–Appellant.**

No. SD 29749.

Missouri Court of Appeals, Southern District, Division One.

Dec. 10, 2010.

Donald R. Cooley, Springfield, MO, for Appellant.

Chris Koster, Atty. Gen., Jayne T. Woods, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Presiding Judge.

A jury convicted Esther Wadley (Defendant) of conspiracy to commit first-degree murder. *See* § 564.016.[1] On appeal, Defendant presents three points of alleged error. Finding no merit in any of these points, we affirm.

*Point I—Sufficiency of the Evidence*

■ Defendant's first point challenges the sufficiency of the evidence to support her conviction. We view the evidence and all reasonable inferences derived therefrom in the light most favorable to the verdict; all contrary evidence and inferences are disregarded. *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005). "We defer to the jurors' superior position to weigh and value the evidence, determine the witnesses' credibility and resolve any inconsistencies in their testimony." *State v. Lopez–McCurdy*, 266 S.W.3d 874, 876 (Mo.App.2008). Viewed from this perspective, the following evidence was adduced at trial.

Defendant married Joshua Millager (Millager) in October 1996 while she was a medical student completing an internship. During the marriage, they had one child. Their daughter, Crystal Millager (Crystal), was born in 1997.[2] After Defendant completed her medical residency, the couple moved to Barry County, Missouri. Defendant practiced family medicine at a small clinic in Aurora. In 2000, Defendant moved her clinic to Republic. Defendant's marriage deteriorated, and she separated

---

1. All references to statutes are to RSMo (2000). All references to rules are to Missouri Court Rules (2010).

2. Because several witnesses share the same surnames, we refer to them by their first names for purposes of clarity.

from Millager in December 2002. Defendant filed a dissolution petition in Barry County. The couple went through protracted litigation for the next two years. In December 2004, the court entered a judgment that dissolved the marriage and awarded sole physical and legal custody of Crystal to Millager. Defendant was awarded visitation, which she exercised. She was upset about the custody arrangement.

In April 2006, Millager was dating Crissy Phillips (Crissy). She had a son named Dustin Phillips (Dustin). Crystal and Dustin attended a bible study program at a church in Aurora. The children received awards during a ceremony at the church on April 27th. Defendant attended the event and took a number of photographs. One photograph was a picture of Millager and Crystal. Another photograph was a picture of Millager, Crystal, Crissy and Dustin.

Paul Bell (Bell), who at one time had lived in Tennessee, had moved to Marionville in 2001 after he became disabled. He began receiving treatment from Defendant at her medical clinic in Republic. Bell was a patient of Defendant until she closed her practice in May 2003. During that time, Bell had approximately 35 office visits with Defendant. They had a typical doctor-patient relationship.

Bell frequented the Christian Service Center (the Center) in Aurora to get help with groceries. On October 9, 2007, Bell was at the Center when he saw Defendant. They spoke to each other for a few minutes. During this conversation, Defendant asked Bell if she could hire him to murder her ex-husband, Millager. On direct examination, Bell described the conversation this way:

Q. What was the reason you were going down there to talk?

A. She was wanting to discuss a situation that she wanted to check with me about having done.

Q. And what was that situation?

A. It was called murder for hire.

Q. When was that brought up? When was the first time that was brought up, murder for hire?

A. On the 9th.

Q. Did she tell you who she wanted murdered?

A. Yes, sir.

Q. Who was that?

A. It was her ex-husband.

On October 11th, Bell and Defendant met at the Center. She gave her cell phone number to Bell so he could contact her. Defendant then drove Bell to a downtown café to talk about Millager's murder. On direct examination, Bell described the meeting in this way:

Q. What was the nature of that conversation that you had down there at the café?

A. The nature of it was just to see if she was honestly serious about what she was telling us she wanted done to her ex-husband.

Q. Did you say that—did you tell her you could help her out?

A. Yes, I did.

Q. What did you tell her you could do?

A. I just told her I knew somebody that done things like that.

Q. Okay. Did you tell her where that person lived or—

A. Well, I just said I had a buddy—

Q. Okay.

A. —down south.

Bell estimated that it would take $200 in expense money for him to speak to his buddy. After Bell did so, he would let Defendant know and set up a meeting between her and his buddy. The meeting

between Defendant and Bell lasted 30–45 minutes. Defendant drove Bell back to the Center and dropped him off. They planned to get together later that day. Bell gave Defendant directions to a store near his house where they would meet.

Defendant arrived at the store around 5:30 p.m. and followed Bell to his house. Defendant began talking with Bell and his wife, Theresa Bell (Theresa). Defendant wanted to regain custody of her daughter. During that conversation, Defendant handed Bell an envelope containing a piece of paper and two color photographs. Millager's full name, address, place of employment, date of birth, social security number and description of his vehicle had been handwritten on the piece of paper. The first photograph was a picture of Millager and Crystal that Defendant had taken at the Aurora church on April 27th. The second photograph was a picture of Millager, Crystal, Crissy and Dustin that Defendant had taken at the Aurora church on April 27th. When Bell removed this photograph from the envelope, Defendant pointed to Millager and said he was her ex-husband. Defendant explained what she wanted Bell to do:

> Q. Okay. And when you say that she talked to you about her husband, what did she say? Or ex-husband. What did she say?
>
> A. She said that's the—that's the gentleman that she wants put away. Now, that is what she told me.
>
> Q. Okay. Did she say what she meant by put away?
>
> A. Yeah. She wants him dead.
>
> Q. Okay.
>
> A. Point blank, that's how she said it to me. Wants him dead.

Defendant seemed "sincere" and "[m]ost definitely" wanted Millager killed. Defendant wanted the murder to take place as quickly as it could be done. She wanted it to look like a burglary that had gone bad. She gave Bell instructions about taking various items of value in the house like jewelry and weapons. To make sure that Defendant and Crystal were not around when Millager was killed, Defendant said that she wanted the murder committed on a weekend when she had custody of Crystal. That way, "[Defendant] would have enough people to know where they were in case something was said." Defendant promised Bell money if Millager were killed. Defendant told Bell that "when it was said and done the person would be well taken care of." Defendant also mentioned that Crissy and Dustin might be present at the house with Millager. Defendant said "it would be a shame if something happened to all of them, wouldn't it?" Defendant stayed at Bell's house until 11:00 p.m. talking about what was going to be done.

The next day, Bell was planning to leave town. Defendant told Bell to go to the Center to pick up $200 that she had left there for him. This was "expense money for [Bell] to go find a hit man[.]" Bell went to the Center and picked up two $100 bills. Initially, Bell did try to hire a hit man. He called a friend and asked him to do it, but that person declined. Bell then had a change of heart and called the F.B.I. That agency contacted local law enforcement.

On October 17th, Sgt. James Musche of the Missouri Highway Patrol came to Bell's home to interview him. Bell reported that he had been approached by Defendant to find someone to kill Millager for her. Bell agreed to cooperate in the investigation. He gave Sgt. Musche the two photographs and the piece of paper Defendant had left there. While Sgt. Musche was there, Bell called Defendant to see whether she still wanted to go through with the murder. Bell asked Defendant if

she still wanted Millager "put away." Defendant said she did. She agreed to meet with Bell's buddy.

On October 18th, Bell called Defendant. The purpose of this call was to attempt to introduce Defendant to an undercover officer posing as the "hit man" Defendant has asked Bell to find. This telephone conversation was recorded. Bell told Defendant that his buddy wanted to meet her that afternoon. Defendant was reluctant to do so and said, "I thought the whole thing was that I'm not supposed to know anything." Bell said his buddy wanted Defendant to give him a little money up front "to get this over with." The following conversation then occurred:

> Bell: Oh, okay. But no, you just, you just tell me if you wanna think it over and meet me some time tomorrow or do you want to meet him today and, and us get everything together and go from there 'cause you know you have your kid tomorrow, evening.
>
> Wadley: Yeah I know I'll have her.
>
> Bell: And you'll have her this weekend.
>
> Wadley: Um huh, yeah, she's all excited . . . to see her mommy.
>
> Bell: Yeah, I guess she'll be glad to see her momma. I mean that's up to you now. You know what you wanna do.
>
> Wadley: Yeah, I know what I want. The problem is that I don't trust anyone with anything anymore.
>
> Bell: Well I need to let him know Doc, 'cause, you know—I can't just keep him hanging out.
>
> Wadley: It was already discussed.
>
> Bell: No, what I'm saying is do ya, ah are you are you dead serious about it? And if so, we need to get together, get this down pat and over with.

Wadley: Okay, where do you want to meet?

Defendant agreed to meet Bell and his "buddy" at Sutherland's lumber yard in Aurora.

Bell then met with Sgt. Musche and his fellow officers, Sgt. Mike Rogers and Sgt. Roger Renken. Bell surrendered the two $100 bills he had picked up at the Center. He had thrown away the envelope in which the bills had been placed. The plan was for Bell, Theresa and Sgt. Rogers to go to Sutherland's and call Defendant to see whether she would come there to meet them. Sgt. Rogers would pose as the "hit man." Sgt. Renken and Sgt. Musche would observe events and try to record them from a surveillance van.

Bell and Theresa drove to Sutherland's in their Camry. When they arrived, Sgt. Rogers got into the Camry with them. Bell and Sgt. Rogers were in the front seats; Theresa was sitting in one of the back seats. Sgt. Rogers had with him the two color photographs and the piece of paper that Defendant had given to Bell. When Defendant arrived, she parked her car and got into the back seat of the Camry. Sgt. Rogers showed the two photographs and the piece of paper to Defendant and asked her what she wanted done. Defendant said she wanted Millager killed. Defendant also said Bell knew what she wanted done. She explained that she wanted it to look like a particular movie that she had seen on television. When Sgt. Rogers asked Defendant for money, Defendant responded by saying "when it is all said and done he knows that it will be tooken [sic] good care of." She got out of the Camry and returned to her vehicle. Sgt. Rogers followed her, and the two talked for a few minutes. Bell was not able to hear what was being said.[3] Bell

---

3. Due to technical difficulties, none of the officers were able to make any audio or video recordings of what transpired at the lumber yard.

and Theresa left while Defendant and Sgt. Rogers were still talking.

Defendant was arrested on December 3, 2007. In relevant part, the first amended information alleged that Defendant committed the class B felony of conspiracy because Defendant, "with the purpose of promoting and facilitating the offense of murder in the first degree, agreed with Paul Bell and Theresa Bell to hire a person to murder Joshua Millager, and in furtherance of the conspiracy, [D]efendant, provided two hundred dollars to Paul Bell for the purposes of paying expenses related to hiring a person to kill Joshua Millager."

After the State rested, Defendant filed a motion for judgment of acquittal at the close of the State's evidence. That motion was denied. Defendant rested without presenting any evidence. Defendant's motion for judgment of acquittal at the close of all of the evidence also was overruled.

 In Defendant's first point on appeal, she contends the trial court erred in denying her motions for judgments of acquittal. In a jury-tried case, an appellate court reviews a trial court's ruling on a motion for judgment of acquittal to determine whether the State made a submissible case. This requirement is satisfied if a reasonable juror could find each element of the crime beyond a reasonable doubt. *State v. Rousan*, 961 S.W.2d 831, 841 (Mo. banc 1998); *State v. Jeffries*, 272 S.W.3d 883, 883 (Mo.App.2008). Defendant was charged with conspiracy to commit murder in violation of § 564.016. In relevant part, this statute states:

1. A person is guilty of conspiracy with another person or persons to commit an offense if, with the purpose of promoting or facilitating its commission he agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such offense.

. . . .

4. No person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

§ 564.016. Thus, a person is guilty of conspiracy to commit an offense if: (1) he or she has the purpose to promote or facilitate the commission of the offense; (2) he or she agrees with one or more persons that they or one of them will engage in conduct which constitutes the offense; and (3) at least one member of the conspiracy commits an overt act in pursuance of the agreement. *State v. Madewell*, 846 S.W.2d 208, 209 (Mo.App.1993). The State presented substantial evidence from which a reasonable juror could find each element beyond a reasonable doubt.

First, the State presented substantial evidence that it was Defendant's purpose to promote or facilitate the death of her ex-husband, Millager. When Defendant and Bell met by chance at the Center, Defendant said that she wanted Millager murdered. During the meeting at Bell's home, Defendant said that she wanted Millager dead. Defendant proposed a plan for how the murder should be committed. She furnished Bell with specific information that could be used to identify Millager. She promised that she would take good care of the person who committed the murder. When Defendant was in the Camry, she again said that she wanted Millager killed.

Second, the State presented substantial evidence that it was Defendant's intent that Bell and the "hit man"—whom Sgt. Rogers pretended to be—engage in conduct which constituted the offense of murder. During the meeting at the café, Bell

said he knew someone who might commit the murder. Bell estimated that it would take $200 in expense money to contact that person. During the meeting at Bell's home, Defendant provided Bell with photographs of Millager and detailed personal information about him. She provided Bell with instructions on valuables that could be taken from Millager's house to make the murder appear to have been a burglary gone awry. Before Bell left town, Defendant gave him the $200 as expense money to go find a hit man. When Bell called Defendant on October 17th to see if she still wanted to go through with the murder, Defendant said she did. She agreed to meet with the "hit man." While Defendant was in the Camry, she again stated that she wanted Millager killed. She told Sgt. Rogers, who was posing as the "hit man," that she wanted the murder committed in the same way as a movie she had seen on television. When Sgt. Rogers asked for money, Defendant replied that she would take good care of him when everything was done.

Third, the State presented substantial evidence that Defendant committed at least three overt acts in furtherance of the conspiracy. The first overt act was giving Bell photographs and other specific identifying information about Millager. The second overt act was giving Bell $200 as expense money to find a hit man. The third overt act was meeting Sgt. Rogers, who was posing as the "hit man."

■ Defendant argues, however, that the State's evidence was insufficient because there was no evidence of any agreement between Defendant and Bell to murder Millager. As support for that argument, Defendant relies upon testimony by Bell that he never intended to actually be involved in Millager's murder. This argument is misdirected because it is only necessary for Defendant to have had the subjective intent that Millager be murdered in order for the crime of conspiracy to occur. *Bishop v. State*, 969 S.W.2d 366, 369 (Mo.App.1998). "The subjective intent of the other individual, the person with whom the defendant is alleged to have conspired, is irrelevant." *State v. Hlavaty*, 871 S.W.2d 600, 605 (Mo.App. 1994). Our conspiracy statute adopted a unilateral theory of conspiracy. *State v. Welty*, 729 S.W.2d 594, 596 (Mo.App. 1987). Thus, it was not necessary for the State to present evidence that Bell, Theresa or Sgt. Rogers actually shared Defendant's intention that Millager be murdered in order for Defendant to be convicted of conspiracy. *State v. Simpson*, 779 S.W.2d 274, 281 (Mo.App. 1989); *State v. Hohensee*, 650 S.W.2d 268, 275–76 (Mo.App.1982).

■ Defendant also argues that the State's evidence was insufficient because there was no evidence of any agreement between Defendant and Theresa to murder Millager. This argument fails for the same reasons set forth above. In addition, "[a] defendant charged with conspiring with others may be convicted on proof of conspiracy with any of the others and without proof all participated in the conspiracy." *State v. Ray*, 768 S.W.2d 119, 122 (Mo.App.1988). Point I is denied.

### Point II—Allegedly Improper Rebuttal Argument

■ Defendant's second point challenges an allegedly improper rebuttal argument by the State. The following facts are relevant to this point.

During Defendant's closing argument, her counsel attacked Bell's credibility. Counsel argued that:

This man, who [you are] going to be asked to believe beyond a reasonable doubt, that this woman committed what

he says to be one of the most heinous offenses that we have in criminal law, is a man who sat right in front of you, and we will go through them, on more than three to five occasions looked you square in the face and lied.

Counsel then reviewed the evidence upon which he relied to make this argument. Later, counsel returned to this argument and said it was "a travesty to think that this lady is sitting in this courtroom based on the word of a—of a professed perjurer trying to ask you to find her guilty of something beyond a reasonable doubt." Counsel argued that "Paul Bell, the one and only person, with these tape recordings that don't say anything, is here today, inconsequentially, amazingly enough, the only source of information that they are asking you to find a lady guilty of conspiracy to commit murder." Toward the end of the argument, counsel described Bell as "one person who is unequivocally a liar...."

During the State's rebuttal argument, the prosecutor disputed defense counsel's argument that Bell was lying:

I submit to you there are things in this case that confirm Paul Bell. [Defense counsel] wants you to believe Paul Bell is a liar. Why would Paul Bell come in and tell these stories, and get involved in this criminal case, and be subjected to cross-examination, and be called a liar? He has taken an oath. He may not remember everything that happened on October the 9th, specifically, and he may have been stupid enough to go ahead and throw away the envelope. He is not a police officer. He wasn't even sure what he was going to do at that time. Maybe he thought he was never going to get the $200.00, but when it showed up he certainly didn't look a gift horse in the mouth. He took it, and I think at some point you've got to believe that

Paul started thinking, that conscience that comes on in the back of each one of our heads, that little voice that we hear.... And Paul Bell had that conscience. Thank God he did.

The prosecutor then recounted evidence which, in his view, supported Bell's testimony. At the conclusion of the rebuttal argument, the prosecutor stated:

Justice needs to be done here, ladies and gentlemen. Justice for [Millager], who could have just as easily been dead today, whose daughter could just as easily have lost her father last year if it wasn't for this man right here. And [defense counsel] can call him a liar, and he can try to discredit Paul Bell, but I would take a hundred of Paul Bell's [sic] tomorrow, who had the conscience to come in here and say, no, I am not going to do this, than to have one of this lady right here.

Defense counsel objected that this was "blatant personalization" about what the prosecutor would think or do and requested a mistrial. The court overruled the objection and denied the request for a mistrial.

■ In Defendant's second point, she contends the trial court erred by overruling the objection and denying the request for a mistrial. We review the trial court's ruling on an objection to closing argument for abuse of discretion. *State v. Burton*, 219 S.W.3d 778, 781 (Mo.App.2007). A trial court abuses its discretion when its ruling is clearly against the logic of circumstances before it and when the ruling is so arbitrary as to shock this Court's sense of justice and indicate a lack of careful consideration. *State v. Wheeler*, 219 S.W.3d 811, 815 (Mo.App.2007). An appellate court will reverse a conviction "only if the challenged comments had a decisive effect on the jury verdict, meaning that there is a reasonable probability that,

in the absence of the comments, the verdict would have been different." *State v. Smith*, 32 S.W.3d 532, 552 (Mo. banc 2000). The burden is on the defendant to demonstrate the decisive effect of the comments. *State v. Miller*, 226 S.W.3d 262, 266 (Mo. App.2007); *State v. Vanlue*, 216 S.W.3d 729, 734 (Mo.App.2007).

 We also review a trial court's refusal to grant a mistrial for abuse of discretion. *State v. Norman*, 243 S.W.3d 466, 472 (Mo.App.2007). "This is because the trial court has observed the complained of incident that precipitated the request for a mistrial and is in a better position than is the appellate court to determine what prejudicial effect, if any, the incident had on the jury." *Wheeler*, 219 S.W.3d at 815. A mistrial is a drastic remedy, appropriate only in extraordinary circumstances where prejudice cannot be removed otherwise. *Id.*

 Defendant argues that the prosecutor's comments implied personal knowledge outside of the record. We disagree. The record reveals that the prosecutor's rebuttal argument was intended to respond to defense counsel's assertions that Bell was a liar. The prosecutor argued that Bell decided to contact police, and thereby attempt to stop Defendant from having Millager murdered, because Bell was motivated to do so by his conscience. This argument was a reasonable inference that the jurors could draw from Bell's testimony that he initially tried to hire a hit man, but he then had a change of heart and contacted law enforcement. A prosecutor has the right to comment on a witness' credibility from the State's viewpoint. *State v. Wright*, 216 S.W.3d 196, 201 (Mo.App.2007). "Vouching occurs when a prosecutor implies that he or she has facts establishing the veracity of a state's witness that are not before the jury for their consideration." *Glover v. State*,

225 S.W.3d 425, 430 (Mo. banc 2007). "Stating that a witness is telling the truth does not constitute vouching as long as the prosecutor does not imply that the statement is based on evidence not before the jury." *Id.* Nothing in the record before us supports Defendant's assertion that the prosecutor's rebuttal argument implied knowledge of facts not before the jury. The prosecutor simply argued that a person motivated to act by conscience was worthy of belief. In sum, the trial court did not abuse its discretion in overruling the objection and denying the request for a mistrial. Point II is denied.

### Point III—Refusal to Give a Not-in-MAI–CR Jury Instruction

 Defendant's third point challenges the trial court's decision not to give a not-in-MAI–CR instruction tendered by Defendant. The following facts are relevant to this point.

During the instruction conference, the State offered Instruction No. 5. This instruction, which was the verdict director for the conspiracy charge, stated:

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about October 18, 2007, in the County of Lawrence, State of Missouri, the defendant agreed with Paul Bell and Theresa Bell that one or more of them would engage in conduct consisting of murder of Joshua Millager, and

Second, that defendant so agreed with the purpose of facilitating that offense, and

Third, that in furtherance of that agreement the defendant thereafter engaged in the following act: provided to Paul Bell $200.00 in cash for purpose of paying expenses for hiring a person to kill Joshua Millager;

then you will find the defendant guilty of conspiracy to commit murder in the first degree.

A person commits the offense of murder in the first degree when she knowingly causes the death of another person after deliberation upon the matter.

The following terms used in this instruction are defined as follows:

Deliberation—which means cool reflection upon the matter for any length of time no matter how brief.

Purpose—a person acts purposely, or with purpose, with respect to the person's conduct or to a result thereof when it is his or her conscious object to engage in that conduct or to cause that result.

This instruction was based upon pattern instruction MAI–CR 3d 304.10. Paragraph third had been modified at defense counsel's request. Defendant had no objection to Instruction No. 5. Defense counsel offered the following not-in-MAI–CR instruction, which was marked by the trial court as "Instruction No. A" (Instruction A):

If you find that the defendant conspired to commit the charged offense of Conspiracy to Commit First Degree Murder, but prevented the accomplishment of the objective of the conspiracy under circumstances manifesting a renunciation of defendants [sic] criminal purpose, you must find defendant not guilty.

The court refused to give this instruction.

Defendant's third point contends the trial court erred in refusing Instruction A. Defendant argues that this instruction should have been given to submit the defense of renunciation to the jury, as authorized by § 564.016.5(1).[4] We disagree.

MAI–CR 3d 304.10 is the pattern MAI–CR instruction for submitting a charge of conspiracy to commit an offense. Notes on Use 5 states:

Section 564.016.5 provides for the defense of renunciation. The "burden of injecting the issue" of the defense of renunciation is on the defendant. Whenever there is evidence supporting this defense, upon written request in proper form by either party or on the Court's own motion, a paragraph submitting the defense will be added to the verdict director as follows: Add the word ",and" to the last numbered paragraph of the verdict director and then insert the following:

(Third) (Fourth) ( [*next numbered paragraph* ] ), that defendant did not prevent the commission of [*name of offense and its object* ] under circumstances indicating he had renounced any criminal purpose to commit the offense.

For a discussion of the defense of renunciation and other provisions of the conspiracy statute, see the comment under Section 9.020 of the Proposed Criminal Code of Missouri (1973), reprinted with Section 564.016, VAMS. Note in particular the distinction between the doctrines of renunciation and withdrawal.

MAI–CR 3d 304.10, Notes on Use 5. Rule 28.02(c) states that "[w]henever there is an MAI–CR instruction or verdict form applicable under the law and Notes On Use, the MAI–CR instruction or verdict form shall be given or used to the exclusion of any other instruction or verdict form." *Id.* In order for the defense of renunciation to be properly submitted to the jury, Instruction No. 5 would have to have been modified in the manner required by MAI–CR 3d

---

**4.** This subsection of the statute states: "No one shall be convicted of conspiracy if, after conspiring to commit the offense, he prevent-ed the accomplishment of the objectives of the conspiracy under circumstances manifesting a renunciation of his criminal purpose."

304.10, Notes on Use 5. Because Instruction A did not follow the requirements of the applicable MAI–CR instruction, the trial court did not err in refusing it. *See State v. Greer,* 879 S.W.2d 683, 685 (Mo. App.1994) (holding that a trial court did not err in refusing to give a not-in-MAI–CR instruction which failed to follow the applicable MAI–CR instruction for submitting the defense of duress). Point III is denied.

The judgment of the trial court is affirmed.

BARNEY and BURRELL, JJ., Concur.